IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEROL DE GASTYNE, *pro se*,    )
                               )
    Plaintiff,          )
                               )
       v.               )
                               )    1:10cv271 (JCC)
ENTRUST, INC., *et al.*,        )
                               )
    Defendants.         )


# M E M O R A N D U M   O P I N I O N

This case is before the Court on a Motion to Dismiss, or, in the alternative, for a More Definite Statement, filed by Entrust, Inc., Peter Bello, Santosh Chokhani, and Jeffrey Brooks (collectively, the "Defendants"). For the following reasons, this Court will grant Defendants' Motion to Dismiss.

## I.    Background

Fereol S. de Gastyne (the "Plaintiff" or "de Gastyne") was employed by Defendant software provider Entrust, Inc. ("Entrust") from February 12, 2007, until October 22, 2007.[1] (Amended Complaint ("Compl.") at 7, 56; Notice of Removal [Dkt. 1.], Ex. 6 ("Stipulated to Exhibits to Plaintiff's Virginia Circuit Court Complaint") at Ex. 1 ("Offer Letter")).[2] Defendant

---

[1] The Court will cite to the Amended Complaint by page number rather paragraph number.
[2] Plaintiff consented to the entry of an order in Virginia state court stating that several specified documents "shall be considered as part of the [re-

1

Peter Bello ("Bello") was a Senior Vice President of Entrust and was Plaintiff's direct supervisor throughout Plaintiff's period of employment with Entrust. (Compl. at 8.) During that same time period, Defendant Dr. Santosh Chokhani ("Chokhani") was a Vice President of Entrust, and his office was adjacent to the Plaintiff's office. (Compl. at 8.) Defendant Jeffrey D. Brooks ("Brooks") assisted in the hiring of Plaintiff, and his office was located near to those of Bello, Chokhani and Plaintiff. (Compl. at 8.)

Plaintiff signed an Offer Letter from Entrust on February 12, 2007. (Compl. at 32; Ex. 1 at 2.) The Offer Letter states that his "employment with the Company is at will" and that the "terms and conditions of employment, including but not limited to termination, demotion, promotion, transfer, compensation, benefits, duties and location of work" could be "changed with or without cause, for any or no reason, and with or without notice." (Ex. 1 at 1.) The position offered to him was "Account Executive – Department of Defense and Intelligence

<hr />

filed] complaint." (*See* Notice of Removal [Dkt. 1.] Exs. 6 & 7.) Each of those documents is incorporated by reference in Plaintiff's Amended Complaint. (*See* Compl. at 3.) The Court may examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" in its consideration of a motion to dismiss, and so this Court will consider these exhibits here. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). For ease of citation, the stipulated exhibits will be referred to only by their exhibit number from the Virginia Circuit Court's March 12, 2010 Order (i.e., Exhibits 1-7). (*See* Dkt. 1, Ex. 6 at 77.)

– Federal Sales" and the Offer Letter lists his supervisor as "Peter Bello."  (Ex. 1 at 1.)

Plaintiff alleges that Bello "represented to the Plaintiff that Plaintiff would be responsible for, and compensated for, all sales activities within his assigned territory." (Compl. at 36.)  Plaintiff further alleges that "when Defendant Bello offered the position to Plaintiff, it was Bello's present intention to transfer Plaintiff's accounts to other account executives within the Entrust Federal sales office."[3]  (Compl. at 49.)  Plaintiff further alleges that it was Defendants' intention that Plaintiff rely on Bello's representation that Plaintiff would manage and be compensated for all account activities within Plaintiff's agreed-upon territory.  (Compl. at 36.)  Plaintiff "did rely on Bello's representation at the time the contract was made."  (Compl. at 36.)  Additionally, Plaintiff alleges that upon his arrival at Entrust, he was denied access to training programs that others were allowed to attend.  (Compl. at 12-13.)

Approximately halfway through Plaintiff's time at Entrust, Brooks asked Plaintiff if he was depressed.  At that time, Plaintiff informed Brooks that Plaintiff "was suffering from deepening depression, and that he was treating the mental

---

[3] These allegations directly conflict with Plaintiff's allegations that Defendants transferred accounts away from Plaintiff upon learning he suffered from "Depression." (*See, e.g.*, Compl. at 17, 23, 33.)

illness with medication and therapy." (Ex. 2 Letter from
Plaintiff to Bello (June 11, 2007) ("June 11 Letter")) at 1;
Compl. at 39.) On June 11, 2007, Plaintiff informed Bello in
writing that he "suffer[ed] from Depression" and that he had
concerns about "the attitude [he] was experiencing from fellow
employees," which he described as "just short of hostile, or
passive-aggressive." (Ex. 2; Compl. at 17, 23.) He also
specifically alleges: that he was denied "incoming DoD leads" by
the new "Internal Federal Rep" (Compl. 33; Ex. 2); that other
Entrust employees were making calls to his sales accounts
(Compl. 33; Ex. 2); and that fellow employees "refus[ed] to
return [his] phone calls or respond to email requests." (Ex.
2.) Plaintiff alleges that Defendants' failure to arrange a
meeting to address these concerns "resulted in heightened
feelings of humiliation and despair." (Compl. at 16-17.)

On June 16, 2007, Bello and Chokhani, Plaintiff's
superiors, "failed to attend a strategy meeting with Plaintiff."
(Compl. at 15.) There were "several such 'no show' incidents by
Bello." (Compl. at 16.) On June 19, 2007, Plaintiff sent a
letter to Entrust's Director of Human Resources, Laura Owen
("Owen"), that was substantially similar to the June 11 Letter
and informed her that Defendant Bello was creating what
Plaintiff believed to be a hostile work environment. (Compl. at
14; Ex. 3 (Fax from Plaintiff to Owen (June 19, 2007) at 1-3).)

In early July 2007, Plaintiff "became alarmed" that
"the process being followed by Entrust" in its sales efforts
with respect to Defense Logistics Agency ("DLA") was contrary to
procurement regulations.  (Compl. at 57.)  On July 17, 2007
Plaintiff sent various documents to Entrust counsel for review
and to seek legal advice about possible organizational conflicts
of interest between Entrust and two of its subsidiaries,
Cygnacom and Orion Security, involving DLA. (Compl. at 43, 57.)
Entrust's counsel responded by immediately forwarding the
relevant service contracts between Entrust and its subsidiaries
to Plaintiff for Plaintiff's review.  (Compl. at 44.)  "Within
minutes" of being copied on emails from counsel to the
Plaintiff, Defendant Bello called the Plaintiff, asked him to
return immediately to the office, and ordered Plaintiff to
delete the Cygnacom/Orion contracts with DLA from his computer.
(Compl. at 44.)  Plaintiff complied "without delay or
complaint."  (Compl. 44, 58.)  Two weeks later, on July 28,
2007, Plaintiff filed "a whistleblower claim as a government
contractor with the office of the United States Defense
Department Inspector General, with regard to the activities of
the Defendants at the DLA headquarters, located at Fort Belvoir,
Virginia."  (Compl. at 45.)

On or about August 1, 2007, and continuing thereafter
until Plaintiff's resignation, the Complaint alleges that "the

Plaintiff was ostracized by his co-workers and . . . Defendant managers were aware of the 'discriminatory' behaviors of co-workers." (Compl. at 18.) On August 31, 2007, Plaintiff again told Entrust's Human Resources ("HR") Department (by way of Owen) about his concerns regarding the "treatment he was receiving at the hands of Defendants," however, his email also stated that the workplace environment had "shifted to a more accepting attitude" after he previously expressed his concerns regarding discrimination to Entrust's HR department. (Compl. at 18; Ex. 4 (Email from Plaintiff to Owen (August 31, 2007)) at 1.) Owen replied that it was Entrust's understanding, "based on our earlier conversations, [that] there are no specific accommodations that you are requesting" and requested that Plaintiff let her know "immediately" if that were not the case. (Ex. 5 (Email from Owen to Plaintiff (September 5, 2007)).) In his September 5 reply, Plaintiff stated: "I continue to maintain that I require no accommodations to accomplish the duties of my position." (Compl. at 18; Ex. 5.)

On September 14, 2007, General Counsel for Entrust "issued a memo that transferred the DLA account from the Plaintiff to Brooks, and indicated that Entrust was taking this action and other reassignments to cure an 'organizational conflict of interest within Entrust and its subsidiaries.'" (Compl. at 45-46.) On October 2, 2007, Entrust "interrogated"

Plaintiff for nine hours at the law offices of Gibson Dunn regarding a "whistle-blower" complaint filed by Plaintiff alleging conflicts of interest in Entrust's sales efforts with respect to a Department of Defense client. (Compl. at 46.) Plaintiff also alleges that this meeting was voluntary. (Compl. at 46.) Nevertheless, Plaintiff further alleges that, in response to his filing a whistleblower complaint, Entrust took "multiple reprisals" against Plaintiff by taking away key accounts (classified as "demotion" by Plaintiff (Compl. at 59, 61)) and denying him sales leads (Compl. at 33).

On October 3, the day after the nine-hour meeting with Defendants' counsel, Plaintiff filed a claim of discrimination against Entrust with the Equal Employment Opportunity Commission ("EEOC") alleging a "discriminatory pattern of behavior" based on his "mental health disabilities." (Compl. at 18; Ex. 6a (October 3, 2007 Letter to EEOC from Plaintiff).) On October 12, 2007, Chokhani visited Plaintiff and stated that he had "heard some comments" and asked "why don't you get another job?" (Compl. at 23.) That same day, Bello and Chokhani "staged a confrontation and display of anger in Plaintiff's office which involved raised voices and slamming of Plaintiff's office door." (Compl. at 18.) Plaintiff alleges that they did this "to induce fear in the mind of the Plaintiff . . . and it did produce the result intended." (Compl. at 18.)

On October 22, 2007, Plaintiff sent a letter to Bello resigning from Entrust and alleging that Defendants discriminated against him based on his mental health disabilities and that Defendants withheld sales opportunities, training and "other resources," thereby preventing him from carrying out his duties. (Ex. 7 (Letter to Bello from Plaintiff (October 22, 2007).) Plaintiff alleges that on October 25, 2007 "Plaintiff and [his therapist] Dr. Ponomarenko agreed to cease treatment of Plaintiff, due primarily to the potential conflict of interest that Dr. Ponomarenko perceived was created by Plaintiff's decision to represent himself in this matter before the Court." (Compl. at 20.)

Plaintiff also includes in his Complaint several allegations of misconduct that are not time specific. At some point during his employment, Plaintiff alleges that he was denied the opportunity to "pay an initial visit" to Plaintiff's customer, DLA. (Compl. at 13.) Plaintiff also alleges that Bello and Chokhani often "openly expressed disgust with each other in an effort in the presence of the Plaintiff to apply increased emotional distress upon the Plaintiff," (Compl. at 15) and that his supervisors directed that Plaintiff be given "numerous improper sales leads" (Compl. at 19-20).

Plaintiff's Amended Complaint alleges that he has two impairments--bipolar disorder and attention deficit disorder

("ADD")--and concedes that the latter is not covered by the Americans with Disabilities Act ("ADA").[4] (Compl. at 74.) Plaintiff generally alleges that his bipolar disorder impacted two major life areas--his mental process and sleeping -- but he does not offer specific details regarding the nature, consequences, or duration of the impact of his bipolar disorder, or explain how he was substantially limited as compared to a person without such a disorder. (Compl. at 74.) Plaintiff also alleges that "due to his regular medication and talk therapy, Plaintiff was qualified for the work he was performing at Entrust" (Compl. at 74), and that he was "fully capable of carrying out all [his] assigned duties as the Entrust [Account Executive] for DoD." (Exs. 2 and 3.)

On November 23, 2009, Plaintiff filed a complaint in Virginia state court, to which Defendants demurred. (*See* Notice of Removal [Dkt. 1] Ex. 1.) After receiving his EEOC right to sue letter, Plaintiff filed, on February 19, 2010, a new complaint in Virginia state court alleging his EEOC-related claims for disability discrimination. (*See* [Dkt 1] Ex. 5.) The parties agreed, and the court on March 12, 2010 ordered, that the cases be consolidated. (*See* [Dkt. 1] Ex. 6.) Defendants then removed the consolidated case to federal court based on the federal cause of action. [Dkt. 1.]

---

[4] All events alleged here occurred before the 2008 amendments to the ADA.

Plaintiff filed an Amended Complaint on April 7, 2010. [Dkt. 3.] The Amended Complaint asserts the following nine causes of action against the Defendants: Intentional Infliction of Emotional Distress (and in the alternative, Negligent Infliction of Emotional Distress) (Count One); "Willful Gross Negligence with Malicious Intent" (Count Two); Breach of Contract (Count Three); Fraud (both Actual Fraud and Constructive Fraud) (Count Four); Constructive Discharge (Count Five); "Retaliatory Discharge in Derogation of Public Policy" (Count Six); Defamation (Count Seven); Conversion (Count Eight); and "Unlawful Employment Discrimination" (Count Nine).

Defendants filed the instant Motion to Dismiss, or, in the alternative, for a More Definite Statement, on April 21, 2010. [Dkt. 6.] Plaintiff opposed on April 28, 2010, and stipulated to the dismissal of the Defamation (Count Seven) and Conversion (Count Eight) causes of action, as well as the removal of the individual Defendants from the Breach of Contract (Count Three) and Illegal Employment Discrimination (Count Nine) causes of action. [Dkt. 9.] The Court accepts Plaintiff's stipulation and will dismiss these claims without analysis. Defendants replied on May 3, 2010. [Dkt. 10.] The case is now before the Court.

## II. **Standard of Review**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). In deciding a Rule 12(b)(6) motion to dismiss, the Court is mindful of the liberal pleading standards under Rule 8, which require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Thus, the Court takes "the material allegations of the complaint" as admitted and liberally construes the complaint in favor of plaintiffs. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). In addition to the complaint, the Court may also examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 127 S. Ct. at 2509.

Although Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Courts will also decline to consider "unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599,

615 n. 26 (4th Cir. 2009)); *see also Ashcroft v. Iqbal*, 129 S.
Ct 1937, 1951-52 (2009).

In *Iqbal*, the Supreme Court expanded upon *Twombly* by
articulating a two-pronged analytical approach to be followed in
any Rule 12(b)(6) case. *Iqbal*, 129 S. Ct at 1951-52. First, a
court must identify and reject legal conclusions unsupported by
factual allegations because they are not entitled to the
presumption of truth. *Id.* at 1951. "[B]are assertions" that
amount to nothing more than a "formulaic recitation of the
elements" do not suffice. *Id.* (citing *Twombly*, 550 U.S. at
555). Second, assuming the veracity of "well-pleaded factual
allegations," a court must conduct a "context-specific"
analysis, drawing on "its judicial experience and common sense,"
and determine whether the factual allegations "plausibly suggest
an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950-51.
Satisfying this "context-specific" test does not require
"detailed factual allegations." *Nemet,* 591 F.3d 254 (citing
*Iqbal* at 1949-50 (quotations omitted)). The complaint must,
however, plead sufficient facts to allow a court, drawing on
"judicial experience and common sense," to infer "more than the
mere possibility of misconduct." *Id.*[5]

---

[5] As this Court will dismiss the Amended Complaint, it need not reach
Defendants' alternative motion for a more definitive statement.

**III. Analysis**

The Court will first address Plaintiff's federal cause of action before turning to his state law claims.

A.    Federal Cause of Action

Plaintiff asserts a cause of action for "unlawful employment discrimination" under the ADA and the Rehabilitation Act ("RA").[6] Defendants argue that Plaintiff has failed to sufficiently allege that he is "disabled" within the meaning of the ADA (or that he has a "handicap" within the meaning of the RA); that he was treated differently because of such a disability; that he was not provided reasonable accommodations; or that he suffered from a discriminatory discharge. (Defs' Mem. in Supp. of their Mot. to Dismiss ("Mem.") at 6-7.) This Court agrees.

For an ADA claim to stand, a plaintiff must adequately allege that he is a "qualified individual with a disability." *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 (4th Cir. 2004). A disability is defined as having a "physical or mental impairment that substantially limits one or more major life activities of such individual"; having "a record of such an impairment"; or being "regarded as having such an impairment."

---

[6] The Court will use the terminology used in the ADA. The ADA and the Rehabilitation Act are generally interpreted in the same manner, including with respect to the definitions of "disability" and "handicap." *See Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57, 59-60 (4th Cir. 1995).

42 U.S.C. §§ 12102(1)(A)-(C). To be substantially limited with respect to a major life activity, a plaintiff must be unable to perform a variety of tasks central to most people's daily lives. *See Toyota Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200-01 (2002); *Rohan*, 375 F.3d at 274. The phrase "substantially limits" "sets a threshold that excludes minor impairments from coverage under the ADA." *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (citing *Sutton v. United Air Lines*, 527 U.S. 471, 486-88 (1999)).[7]

While Plaintiff has alleged that he suffers from bipolar disorder, he has failed to properly allege that this impairment substantially limits him in a major life activity. The Amended Complaint states that his bipolar disorder affected his "thought process" and his "sleep cycle," but it does not offer sufficient factual allegations to demonstrate that the Plaintiff was substantially limited in either of these activities. (*See* Compl. at 74.) While Plaintiff's Amended Complaint contains numerous allegations about difficulties at work, Plaintiff does not allege that any of these resulted from his bipolar disorder. In fact, Plaintiff specifically alleges that "due to his regular medication and talk therapy, Plaintiff

---

[7] The Court notes that all of Plaintiff's allegations relate to conduct that occurred in 2007, before the passage of the ADA Amendments Act of 2008 ("ADAAA"). As a result, the rational of *Toyota* and *Sutton* applies. The ADAAA has not been applied retroactively. *See Shin v. Univ. of Md. Med. Sys. Corp.*, No. 09-1126, 2010 U.S. App. LEXIS 5177, at *17 n.14 (4th Cir. Mar. 11, 2010).

was qualified for the work he was performing at Entrust," and that he was "fully capable of carrying out all [his] assigned duties as the Entrust [Account Executive] for DoD." (Compl. at 74; Exs. 2, 3.) While the Court is sympathetic to the difficulties faced by individuals with bipolar disorder, the Plaintiff here has not shown that his bipolar disorder was a "disability" within the meaning of the ADA, as there are not sufficient factual allegations to show that he was "substantially limited" in a major life activity.[8]

Alternatively, assuming *arguendo* that Plaintiff was considered "disabled" within the meaning of the ADA, he has not alleged any type of an adverse employment action due to such a disability, either in the form of a hostile work environment, a failure to provide reasonable accommodations, or a discriminatory termination. (Mem. at 9; *see* 42 U.S.C. § 12112(a).) To set out a hostile work environment claim, Plaintiff must show harassment based on a disability, and such harassment must be "sufficiently severe or pervasive to alter a term, condition, or privilege of employment." *Fox v. GMC*, 247 F.3d 169, 177 (4th Cir. 2001). For behavior to be "severe and

---

[8] Plaintiff's allegations that he was disabled under the "record of" and "regarded as" prongs fail for additional reasons. *See Sutton*, 527 U.S. at 489; *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001). Plaintiff makes the conclusory allegations that he "has record of that [protected] disability," and that he was "treated by Defendants as if he had a mental disability." (Compl. at 70.) Plaintiff again does not sufficiently allege that there was a "record of" such a disability or that Defendants "regarded [him] as" disabled, as he has not sufficiently alleged that he was substantially limited in a major life activity or that Defendants regarded him as such.

pervasive," it must be both "subjectively and objectively hostile." *Id.* at 178. Plaintiff must also plead a causal connection between his disability and the alleged mistreatment-- that is that the conduct was "because of" his disability. *Mason v. Wyeth, Inc.*, 183 F. App'x 353, 361 (4th Cir. 2006) (finding no liability under the ADA for a hostile work environment where plaintiff was not the only individual targeted for a series of workplace pranks).

Plaintiff here has alleged that, upon learning of his "Depression," Defendants began to stage altercations within Plaintiff's hearing (Compl. at 18), denied him sales leads that would have normally been given to him (Compl. at 19, 34, 42), and reassigned sales targets just prior to Plaintiff being able to close the sale (Compl. at 37-38). Plaintiff further alleges that Defendants did these acts with the full knowledge that Plaintiff suffers from "Depression" and that such things would cause him "frustration, humiliation and fear." (Compl. at 20.) These allegations simply do not rise to the level of hostility required to state a claim under the ADA.

To plead a claim for failure to provide reasonable accommodations, Plaintiff must allege that Entrust could have provided him reasonable accommodations that would have enabled him to perform the essential functions of his position, and that Entrust refused to make those accommodations. *Rhoads*, 257 F.3d

at 387. Plaintiff specifically alleges, however, that he
"declined [his Human Resources representative's] offer to
provide accommodations for his disability." (Compl. at 76.) On
September 5, 2007, Plaintiff wrote to Entrust's HR
representative that "I continue to maintain that I require no
accommodations to accomplish the duties of my position as
A[ccount] E[xecutive] for the DoD/Military territory." (Ex. 5.)
While Plaintiff's allegations indicate that he wanted to have a
meeting with his supervisors regarding his concerns about sales
issues, he was offered and refused the opportunity to discuss
accommodations with the Entrust employee responsible for
providing them. Plaintiff's own words here defeat him. He was
offered "accommodations" but declined.

To properly assert a claim for wrongful discharge
under the ADA, Plaintiff must sufficiently allege "that (1) he
is within the ADA's protected class [assumed *arguendo* here]; (2)
he was discharged; (3) at the time of his discharge, he was
performing the job at a level that met his employer's legitimate
expectations; and (4) his discharge occurred under circumstances
that raise a reasonable inference of unlawful discrimination."
*Haulbrook v. Michelin North America*, 252 F.3d 696, 702 (4th Cir.
2001) (citing *Ennis*, 53 F.3d at 58). Here, Plaintiff was not
"discharged," as he voluntarily resigned his position. (Ex. 7.)
For his resignation to constitute a constructive discharge in

the context of the ADA, Plaintiff must allege: (1) that the
employer's actions were deliberate and (2) that working
conditions were intolerable.  *See Honor v. Booz-Allen &
Hamilton, Inc.,* 383 F.3d 180, 186-87 (4th Cir. 2004); *Barta v.
Sears, Roebuck & Co.*, 307 F. Supp. 2d 773, 776 (E.D. Va. 2004)
(applying constructive discharge in the ADA context).  An
employer's actions are deliberate only if they "were intended by
the employer as an effort to force the plaintiff to quit."
*Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261, 272
(4th Cir. 2001).  Whether an employment environment is
intolerable is determined from the objective perspective of a
reasonable person.  *Williams v. Giant Food, Inc.,* 370 F.3d 423,
434 (4th Cir. 2004).  "However, mere dissatisfaction with work
assignments, a feeling of being unfairly criticized, or
difficult or unpleasant working conditions are not so
intolerable as to compel a reasonable person to resign."  *James
v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 378 (4th Cir.
2004) (internal quotation marks and alterations omitted).  Here,
Plaintiff's allegations above do not sufficiently allege that
Defendants created an "intolerable work environment."

      B.   <u>State Law Claims</u>

      Count One of Plaintiff's Amended Complaint asserts a
cause of action for Intentional Infliction of Emotional Distress
and an alternative cause of action for Negligent Infliction of

Emotional Distress.  (Compl. at 11-28.)  To establish a claim

for intentional infliction of emotional distress, a plaintiff

must sufficiently allege that:  (1) the wrongdoer's conduct was

intentionally reckless; (2) the conduct was outrageous or

intolerable; (3) there was a causal connection between the

wrongdoer's conduct and the resulting emotional distress; and

(4) the resulting emotional distress was severe.  *Supervalu,*

*Inc. v. Johnson,* 276 Va. 356, 369-370 (2008); *Almy v. Grisham,*

273 Va. 68, 77 (2007); *Russo v. White,* 241 Va. 23, 26-27 (1991).

In the Eastern District of Virginia, to survive a motion to

dismiss, a complaint must provide "fair notice of what [his]

claim is and the grounds upon which it rests."  *Hatfill v. New*

*York Times Co.,* 416 F.3d 320, 337 (4th Cir. 2005), *cert. denied,*

126 S. Ct. 1619 (2006).

        The Plaintiff here has failed to allege facts that

would constitute outrageous or intolerable conduct.  Instead,

Plaintiff has alleged, at worst: (1) inconsistent training

program availability (Compl. at 12-13); (2) competitive,

uncooperative, and devious co-workers (Compl. at 13-14, 19-20,

36-39); (3) angry and uncaring supervisors (Compl. at 18-19);

(4) exclusion from meetings (Compl. at 18-19); and (5) busywork

(Compl. at 19-20).  To be sufficient, these allegations must

constitute "conduct . . . so outrageous in character, and so

extreme in degree, as to transcend all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo*, 241 Va. at 29. The standard for what constitutes intolerable conduct is high. In *Burke v. AT&T Tech. Servs. Co.*, the court found that the "racial discrimination that she alleges, consisting of demotion and ultimate termination, while insidious and unacceptable, cannot be labeled the sort of rare offense that is so 'atrocious' that it '[goes] beyond all possible bounds of decency' and is 'utterly intolerable in a civilized society.'" *Burke*, 55 F. Supp. 2d 432, 441 (E.D. Va. 1999). This Court finds that Plaintiff does not allege facts sufficient to show such "intolerable" conduct.

In the alternative, Count One asserts a cause of action for Negligent Infliction of Emotional Distress. In Virginia, "where conduct is merely negligent, not willful, wanton, or vindictive, and physical impact is lacking, there can be no recovery for emotional disturbance alone." *Delk v. Columbia/HCA Healthcare Corp.* 259 Va. 125, 137-138 (Va. 2000) (citing *Hughes v. Moore*, 214 Va. 27, 34 (Va. 1973)). Plaintiff has not alleged a "physical impact" resulting from Defendants' conduct. Furthermore, there can be no actionable negligence unless there is a legal duty, a violation of the duty, and a consequent injury. *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780, (Va. 1951). In Virginia, "there is no duty of reasonable

care imposed upon an employer in the supervision of its employees." *Chesapeake & Potomac Tele. Co. of Virginia v. Dowdy*, 235 Va. 55, 61 (1988) (holding that, even when defendants knew of plaintiff's depression and when their actions aggravated that depression, defendants owed no duty to plaintiff that would support a negligence claim). Count One is therefore dismissed.

Count Two of the Amended Complaint asserts "willful gross negligence with malicious intent." (Compl. at 29.) As this is not a cognizable tort in Virginia, the Court will assume that Plaintiff intends to plead either "willful and wanton negligence" or "gross negligence." Willful and wanton negligence is "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware . . . that his conduct probably would cause injury to another." *Harris v. Harman*, 253 Va. 336, 340-341 (1997). Gross negligence is the "utter disregard of prudence amounting to complete neglect of the safety of another." *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987). Again, *Dowdy* held that there can be no actionable negligence unless there is a legal duty, a violation of the duty, and a consequent injury, and that in Virginia there is no duty of reasonable care imposed upon an employer in the supervision of its employees in these situations. 235 Va. at

61.  Here, Plaintiff has not alleged facts sufficient to state a claim for either willful or gross negligence.

Count Three of the Amended Complaint asserts a breach of contract claim against Entrust.  In Virginia, a breach of contract has occurred when there was (1) a legally enforceable obligation of defendant to plaintiff, (2) a violation or breach of the obligation by the defendant, and (3) an injury or harm to the plaintiff caused by defendant's breach.  *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (Va. 2006).  Defendants argue that the plain language of Plaintiff's employment contract defeats his breach of contract claim.  This Court agrees.

Plaintiff alleges that he was assigned sole responsibility for a specific territory at the commencement of his employment with Entrust.  (Compl. at 32.)  Specifically, Plaintiff alleges that he was given the right to "manage and be compensated for all customer activities and transactions between Entrust, Incorporated and all uniformed military services . . . all U.S. Defense Department . . . accounts, and all agencies comprising the U.S. Intelligence Community."  (Compl. at 32.)  Under Plaintiff's theory, any sales lead or account that fell under this umbrella but was handled by another employee would constitute a breach of Plaintiff's employment contract.  (*See* Compl. 32-34.)

Plaintiff's employment contract with Entrust does not
address the Plaintiff's territory.  (Ex. 1.)  The contract
offered him "at will employment" and stated the "terms and
conditions of employment, including but not limited to
termination, demotion, promotion, transfer, compensation,
benefits, duties and location of work" could be "changed with or
without cause, for any or no reason, and with or without
notice."  (Ex. 1.)  Here, the language of the contract speaks
for itself.  Plaintiff's signed offer letter does not contain
any language granting him exclusive rights to the Defense
Department and U.S. Intelligence Community and, furthermore, the
letter does allow Entrust to alter its terms at any time.[9]  (Ex.
1.)  Count Three is dismissed.

Count Four of the Amended Complaint asserts both
Actual and Constructive Fraud.  (Compl. at 36-50.)  To state a
cause of action for fraud, a plaintiff must plead facts
sufficient to show "(1) a false representation, (2) of a
material fact, (3) made intentionally and knowingly, (4) with
intent to mislead, (5) reliance by the party misled, and (6)

---

[9] Plaintiff makes passing reference to "an adhesion contract with many
restrictive clauses" (Compl. at 32), as well as to "tortious interference
with Plaintiff's ability to perform" under his contract (Compl. at 33-34).
Employment agreements in Virginia, however, are generally not contracts of
adhesion.  *See Senture, LLC v. Dietrich*, 575 F. Supp. 2d 724, 727 n.1 (E.D.
Va. 2008).  Given Plaintiff's status as an at-will employee, he was not bound
to continue working for Entrust, and so his contract cannot be one of
adhesion.  In addition, the doctrine of tortious interference with contract
applies only to a third-party "intermeddler" in a contract.  *See Chaves v.
Johnson*, 230 Va. 112, 120 (1985).

resulting damage to the party misled." *State Farm Mut. Auto. Ins. Co. v. Remley*, 618 S.E.2d 316, 321 (Va. 2005) (citations omitted). In the Fourth Circuit, each element of fraud must be pled with the required degree of specificity: identifying "at a minimum . . . the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008); (Fed. R. Civ. P. 9(b)).

Here, Plaintiff merely alleges that Bello "represented to the Plaintiff that Plaintiff would be responsible for, and compensated for, all sales activities within his assigned territory." (Compl. at 36.) Plaintiff also includes the conclusory allegation that it was Bello's intention that Plaintiff rely on this representation in making his decision to enter into the contract, and that Plaintiff did rely on the Defendant's representation at the time the contract was made. (Compl. at 36.) Plaintiff further alleges that "[a]t the time the contract was made, Bello intended to remove, and did later remove, numerous accounts from the Plaintiff's territory without notifying Plaintiff, which constituted a violation of the employment contract."[10] (Compl. at 36; *see* Compl. at 49.)

_____

[10] These allegations directly conflict with the allegation that Defendants removed the accounts due to discrimination based on a "disability" or that

24

Plaintiff specifically points to three examples where sales contacts within his "territory" were given to (or taken by) other employees. (*See* Compl. at 20, 37-38, 42.) The allegations regarding the false statement do not specify where and when the statement was made, what was specifically said, what the terms "responsible," "compensated" or "assigned territory" meant, nor do they allege why the contract did not memorialize this promise. (*See* Compl. at 36.) These allegations do not allege fraud with the requisite particularity. Count Four is therefore dismissed.

In the alternative, the Plaintiff has not sufficiently alleged reasonable reliance. Under the facts as alleged, Plaintiff could not have reasonably relied on an oral statement regarding the terms and conditions of employment when it was contrary to the express terms of the written employment agreement described above. *See Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994) (fraud requires that "one has represented as true what is really false, in such a way as to induce a reasonable person to believe it"). At a minimum, Defendants would not have had reason to know that Plaintiff was relying on a statement contrary to the written employment agreement. *See Mortarino*, 251 Va. at 295 (finding no fraud

---

they removed the accounts based on "retaliation" for a whistleblower complaint--both allegations that Plaintiff makes elsewhere in the Complaint.

where defendant did not know or have reason to know that

plaintiff would rely on the alleged misrepresentation).[11]

    Count Five of the Amended Complaint asserts a cause of

action for Constructive Discharge.  This cause of action

presents some difficulty for a federal District Court, as the

Virginia Supreme Court has yet to address the issue of whether

an employment discharge can be constructively accomplished.  *See*

*Barron v. Netversant-Northern Virginia, Inc.,* 68 Va. Cir. 247

(Va. Cir. 2005); *Johnson v. Behsudi* 52 Va. Cir. 533, (Va. Cir.

Ct. 1997).  Virginia Circuit Court judges have reached different

conclusions on this issue.  (*Compare Jones v. Prof'l Hospitality*

*Res., Inc.,* 35 Va. Cir. 458 (1995) *and Wright v. Donnelly,* 28

Va. Cir. 185 (1992) (holding that Virginia does not recognize

the tort of wrongful constructive discharge), *with Dowdy v.*

*Bower,* 37 Va. Cir. 432 (1995), *and Molina v. Summer Consultants,*

*Inc.,* Law No. 152715 (Fairfax County Cir. Ct. Dec. 9, 1996)

(holding that Virginia does recognize the tort of wrongful

constructive discharge)).[12]  Regardless, the Plaintiff here is an

_____

[11] Plaintiff's allegation of "Constructive Fraud" is also not well founded.
"A finding of constructive fraud requires proof that a false representation
of a material fact was made, innocently or negligently, and that the injured
party suffered damage as a result of his reliance on the misrepresentation."
*Henderson v. Henderson*, 255 Va. 122, 126 (1998) (citing *Mortarino*, 251 Va. at
295 (1996)).  Here, Plaintiff alleges that the statement was not made
"innocently or negligently" but that Bello "had the present intention to
transfer Plaintiff's accounts to other account executives."  (Compl. at 49.)
[12] Those courts that have found that such a cause of action exists have held
that "to establish constructive discharge, a plaintiff must show that the
termination was in violation of clear and unequivocal public policy of this
Commonwealth, that no person should have to suffer such indignities and that

"at-will" employee.  In Virginia, "an allegation of constructive

discharge does not bring [Plaintiff's claim] within the 'narrow

exception' to the general rule under *Bowman v. State of*

*Keysville*, 229 Va. 534, 540 (Va. 1985) that an at-will employee

can be discharged at any time after reasonable notice without

cause by the employer." *Wright,* 28 Va. Cir. at 186.  Count Five

is dismissed.

Count Six of the Amended Complaint asserts a cause of

action for "Retaliatory Discharge." (Compl. at 55.)  As

Plaintiff recognizes, because he resigned from Entrust, the

Court must first find that Plaintiff was constructively

discharged for any retaliatory discharge claim to lie.  (Compl.

at 55-56.)  As is explained above, this Court does not find that

Plaintiff could properly assert a constructive discharge claim.

Additionally, the Virginia Supreme Court has specifically

"refused to recognize" a "generalized, common-law

'whistleblower' retaliatory discharge claim" as an "exception to

Virginia's employment-at-will doctrine." *Dray v. New Mkt.*

*Poultry Prod., Inc*. 258 Va. 187, 191 (Va. 1999) (citing *Lawrence*

*Chrysler,* 251 Va. at 94).  The Court will dismiss this claim.

---

the employer's actions were deliberate and created intolerable working
conditions." *Padilla v. Silver Diner, et al.,* 63 Va. Cir. 50, 57 (Va. Cir.
Ct. 2003).  As this Court has already determined that Plaintiff has not pled
facts sufficient to demonstrate "intolerable" working conditions in the
Intentional Infliction of Emotional Distress context (*see* Supra at 20), it
reaches the same determination here.

Finally, Plaintiff has stipulated to the withdrawal of Counts Seven (Defamation) and Eight (Conversion), and so those causes of action are not before the Court.

## IV. Conclusion

For the reasons stated above, the Court will grant Defendants' Motion to Dismiss.  An appropriate Order will issue.

|                        |                         /s/                          |
|------------------------|------------------------------------------------------|
| August 24, 2010        |              James C. Cacheris                       |
| Alexandria, Virginia   |      UNITED STATES DISTRICT COURT JUDGE               |